IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CHONDRA DUNN, LORI DUNN, | : | |
| and VALERIE KNIGHT, | : | |
| | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | No. 5:11-CV-489 (CAR) |
| T. GUIDRY, individually and in his | : | |
| official capacity as a Police Officer for | : | |
| the City of Macon, GA Police | : | |
| Department; CITY OF MACON, GA, | : | |
| a municipal corporation of the State | : | |
| of Georgia; MIKE BURNS, | : | |
| individually and in his official capacity: | | |
| as Chief of Police of the City of Macon | : | |
| Police Department; and SERGEANT | : | |
| SMITH, former John Doe #1, in his | : | |
| official capacity as a police officer | : | |
| supervisor for the City of Macon, GA, | : | |
| | : | |
|     Defendants. | : | |
| _____ | : | |

<u>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

    This case arises from unfortunate circumstances. Plaintiffs were attacked and injured shortly after Defendant Guidry, a police officer for the City of Macon, released their attacker from custody.  Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 contending all Defendants violated their constitutional rights to substantive due process

and equal protection by releasing their attacker knowing he posed a dangerous threat to Plaintiffs.  Plaintiffs also assert state law claims under Georgia law.

Before the Court is Defendants' Motion for Summary Judgment [Doc. 34]. After fully considering the matter, the Court finds no triable issues of fact exist as to Plaintiffs' federal claims, and thus, Defendants are entitled to judgment as a matter of law as to these claims.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Thus, Defendants' Motion for Summary Judgment [Doc. 34] is **GRANTED** as to Plaintiffs' federal claims, and their state law claims are hereby **DISMISSED without prejudice**.  Defendants' Motion to Exclude Experts' Testimony [Doc. 22] is **MOOT**.[1]

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine

---

[1] The challenged expert testimony of Gregory Connor and Claudia Taylor has no bearing on the Court's decision in this case.
[2] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986 ).

issue of material fact" and that entitles it to a judgment as a matter of law.[3]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[4]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[5]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[6]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[7]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[8] "The court many not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[9]

---

[3] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

[4] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.

[5] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[7] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380) (2007)).

[8] *Id.* (internal quotation marks omitted).

[9] *Envtl. Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

## BACKGROUND

In the early morning hours of October 24, 2010, a man named Richard Ray Hurd attacked and injured Plaintiffs after Defendant Troy Guidry, a police officer in the Macon Police Department ("MPD"), released Hurd from custody without warning to Plaintiffs.  Only hours earlier, Defendant Guidry had arrested Hurd in response to a domestic disturbance between Plaintiff Valerie Knight and Hurd.  Ms. Knight's granddaughter, Plaintiff Lori Dunn, had witnessed Hurd attack her grandmother with a knife.  After Hurd also threatened and attacked Lori, she frantically called her mother, Plaintiff Chonda Dunn, who called 911 and reported the attacks.

Defendant Guidry was the first of four officers from the MPD to arrive at Ms. Knight's residence.  When the officers arrived, no one was present in the home, but the door to the home was open.[10]  Upon visual inspection, the officers saw that the house was in disarray, with blood on the floor, ceiling, and walls of the house.[11]

After the police arrived, Lori, who had earlier fled the scene, returned to the residence to speak with the police.  Lori explained to Officer Guidry that she had witnessed Hurd attack her grandmother.  Lori stated that she, too, was a victim of Hurd's attack, and he had threatened to kill her.[12]  Lori told Guidry that she had fled the scene, and her grandmother and Hurd were missing.  However, while Lori was

---

[10] McCane Depo., p. 13 [Doc. 59].
[11] Durbin Depo., p. 14 [Doc. 60]; McCane Depo., p. 13 [Doc. 59].
[12] Guidry Depo., p. 78 [Doc. 32].

4

speaking with Guidry, Ms. Knight and Hurd came walking back to the residence.[13] Officer Guidry observed that Ms. Knight was "very composed," did not appear upset, and seemed unharmed.[14]  Mr. Hurd, on the other hand, was bleeding from a large cut on his hand and appeared intoxicated.[15]  At some point in time, Lori had explained to Guidry that during the attack, a chair broke in Hurd's hand after he raised the chair above his head, and it hit the ceiling fan.[16]

When Officer Guidry questioned Ms. Knight about the incident and asked her to explain what happened, she told him "nothing."[17]  After Guidry told Ms. Knight Lori's contradictory account of the incident, Ms. Knight told Officer Guidry that Lori was overreacting, and Lori's account of the incident was false.[18]  Although unclear, it appears Hurd was present while Guidry questioned Ms. Knight.

When questioned away from Hurd, however, Ms. Knight told another officer at the scene that Hurd had taken her from the house at knife point, forced her to hide in the bushes with him, and threatened to kill her if she revealed their location to the police.[19]  That officer relayed this information to Officer Guidry and the other responding officers.[20]

---

[13] L. Dunn Depo., p. 27 [Doc. 28].
[14] Guidry Depo., p. 68 [Doc. 32].
[15] *Id.* at p. 32.
[16] *Id.* at pp. 31, 75.
[17] *Id.* at p. 78.
[18] *Id.* at pp. 78-79.
[19] McCane Depo., p. 14 [Doc. 59].
[20] *Id.* at p. 15.

While at the scene, Officer Guidry confirmed that Hurd had two outstanding warrants issued by the Bibb County Sheriff's Office (not the MPD) for probation violations.[21] Guidry did not inquire about the underlying offenses. Because Guidry had received conflicting information as to whether Hurd had committed a family violence offense in violation of Georgia law, he contacted his supervisor, Defendant Sergeant Smith, seeking advice on whether to arrest Hurd for family violence in addition to the probation violations.[22]  Guidry relayed the conflicting information, and Smith left the decision to Guidry's discretion.[23]

In Officer Guidry's judgment, he did not have probable cause to arrest Hurd for family violence, so Guidry arrested Hurd solely for the probation violations.[24]  When Guidry attempted to handcuff Hurd, he resisted arrest.[25]  It took four officers to arrest Hurd.[26]  After placing Hurd in handcuffs, Guidry told Plaintiffs that Hurd would be in custody for at least a couple of days.  Guidry then drove Hurd to the Bibb County Law Enforcement Center ("LEC") in his police car.

Upon arrival at the LEC, Hurd was booked for the probation violations, but the LEC refused to accept him because he needed medical attention for the cut on his

---

[21] Guidry Depo., p. 42 [Doc. 32].
[22] *Id.* at pp. 51-53.
[23] *Id.* at pp. 52-53.
[24] *Id.* at p. 46.
[25] *Id.* at p. 73.
[26] McCane Depo., pp. 16-17 [Doc. 59]; *see also* Guidry Depo., p. 74 [Doc. 32].

hand.[27]  The LEC form stated that Hurd "needs to have stitches before we can accept him."[28]

When the LEC refuses to accept an arrested suspect because of medical concerns, MPD's policy and practice calls for the arresting officer to contact his supervisor, who will then evaluate whether the officer is to release the suspect or stay with the suspect for medical care.[29] Thus, upon the LEC's refusal to accept Hurd, Guidry again called his supervisor, Defendant Smith.  Like Guidry, Smith never inquired about the underlying offenses Hurd committed to receive the probation violation warrants.  Regardless, Smith told Guidry to take Hurd to the emergency room and release him.[30] Thus, in accordance with his supervisor's instructions, Guidry took Hurd to the emergency room and released him.  Guidry did not inform Plaintiffs that Hurd had been released.

Shortly after Guidry released him, Hurd returned to Ms. Knight's residence and attacked all three Plaintiffs, until Chonda Dunn hit him on the head with a hammer and incapacitated him.  Hurd remained unconscious for a few minutes and then fled the scene.  Over the next three weeks, Hurd called Plaintiffs' home repeatedly and harassed them, until he was ultimately apprehended.

---

[27] Guidry Depo., pp. 53-54 [Doc. 32].
[28] Bibb County LEC Pre-Incarceration Diversion Form [Doc. 54].
[29] Fletcher Depo., pp. 38-39 [Doc. 61]; Durbin Depo., p. 30 [Doc. 60]; James Depo., p. 30 [Doc. 58].
[30] Guidry Depo, p. 55 [Doc. 32].

Plaintiffs filed this § 1983 action against Defendants alleging substantive due process and equal protection violations against the individual officers for releasing Hurd after his arrest when he posed a clear threat to Plaintiffs' safety, and against the City of Macon for the police department's alleged failure to train its officers and failure to implement adequate policies regarding the release of detainees with medical needs and how to handle arrestees with outstanding warrants.

**DISCUSSION**

**I.    Plaintiffs' § 1983 Claims**

Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws."[31]  A plaintiff may bring a § 1983 claim against a governmental entity or person in his individual or official capacity.[32]  Here, Plaintiffs allege that Defendants, through several acts performed under color of law, deprived them of substantive due process and equal protection of the laws in violation of the Fourteenth Amendment.  Accordingly, Plaintiffs must prove that (1) Defendants acted "under color" of law as defined by § 1983 and cases interpreting that language, and (2) Defendants' actions deprived them of a constitutional right.  There is no dispute Defendants were acting under color of law.  Thus, the issue before the Court is

---

[31] 42 U.S.C. § 1983.
[32] *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).

whether, through Defendants' conduct, Plaintiffs suffered a deprivation of some constitutional right.

Plaintiffs have brought a municipal liability claim against the City of Macon; official liability claims against Officer Guidry, Sergeant Smith, and Chief Burns; and individual liability claims against Officer Guidry and Chief Burns. As set forth in detail below, each of these claims is predicated upon a deprivation of Plaintiffs' constitutional rights; because the Court finds Plaintiffs did not suffer such a deprivation, all of the claims fail.  The Court will begin its discussion with Plaintiffs' individual capacity claims.

A. <u>**Individual Capacity Claims and Qualfied Immunity**</u>

Plaintiffs assert that Officer Guidry and Chief Burns violated their constitutional rights by releasing Hurd after his arrest.  Both Defendants counter that they enjoy qualified immunity and are therefore shielded from liability.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[33]  Indeed, qualified immunity offers complete protection for "all but the plainly incompetent or one who is knowingly violating the federal law."[34] In order to receive qualified immunity, the officer "must first prove that 'he was acting within the scope of his

---

[33] *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal quotation marks omitted).
[34] *Oliver v. Fiorino*, 586 F.3d 898, 904 (11th Cir. 2009) (internal quotation and citation omitted).

discretionary authority when the allegedly wrongful acts occurred.'"[35]   Once a defendant proves that he was performing a discretionary function, the burden shifts to the plaintiff to show that the grant of qualified immunity is unmerited.[36]

> 1. Officer Guidry

> > a. Discretionary Authority

Plaintiffs first argue qualified immunity cannot protect Officer Guidry because he was not acting in a discretionary function when he released Hurd after Hurd's official arrest. Instead, Plaintiffs contend Guidry had a "ministerial duty to complete the actual detainment portion of the arrest by turning Hurd over to be incarcerated rather than releasing him."[37]

Whether a government official acts within his discretionary authority turns not on the ministerial versus discretionary nature of an act, but rather on an evaluation of the official's duties and authority.[38]   Indeed, "[q]ualified immunity is available to a government official—even if his actions appear to be ministerial in nature—so long as the official's action '(1) were undertaken pursuant to the performance of his duties' and '(2) were within the scope of his authority.'"[39]   The Eleventh Circuit has clarified

---

[35] *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).

[36] *Oliver*, 586 F.3d at 905 (citing *McCullough*, 559 F.3d at 1205).

[37] Plaintiffs' Response to Defendants' Motion for Summary Judgment, p. 3 [Doc. 39].

[38] *See Jordan v. Doe*, 38 F.3d 1559, 1565-66 (11th Cir. 1994).

[39] *Id*. at 1566 (11th Cir. 1994) (*quoting Rich*, 841 F.2d at 1563-64).

the requirements to establish if an official was acting in his discretionary authority as follows:

> [T]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology. In applying each prong of this test, we look to the general nature of the defendant's actions, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.[40]

Here, the evidence establishes Officer Guidry was acting in the performance of his law enforcement duties and within the scope of his authority when he released Hurd. Officer Guidry used the discretion vested in him as a police officer to arrest Hurd, take him to the LEC, and then release him at his supervisor's direction after the LEC refused to accept Hurd. Several Macon police officers verified that Guidry's actions in releasing Hurd were in accordance with MPD's practice. Retired Lieutenant Carl Fletcher, who was in charge of the day-to-day operations of the MPD's violent crimes division, testified that when the LEC does not accept an arrested suspect because of medical concerns, an officer should contact his supervisor, who will then evaluate whether to release the suspect or stay with the suspect for medical care.[41] Officer Todd Durbin and Sergeant Loyd James likewise testified that when suspects need medical attention, the supervisor will determine whether the arresting officer

---

[40] *Holloman, ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2006) (citations and internal quotation marks omitted).
[41] Fletcher Depo., pp. 38-39 [Doc. 61].

will stay with the suspect or release him to the medical center and take warrants later.[42] Certainly, when releasing Hurd, Officer Guidry was performing a legitimate law enforcement function within his authority as a police officer.

Having established Officer Guidry was acting within his discretionary authority, Plaintiffs must now establish they suffered a violation of their constitutional rights and, if so, that the illegality of Defendants' actions was "clearly established" at the time of the alleged violation.[43]  The question need not be answered in a particular order;[44] thus, this Court first addresses whether a constitutional violation exists.

      b.  Existence of Constitutional Violation

          i.  Substantive Due Process

Plaintiffs contend Officer Guidry violated their Fourteenth Amendment Substantive Due Process rights by releasing Mr. Hurd when he should have been incarcerated.  The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."[45]  Embodied in the Fourteenth Amendment is protection of both procedural and substantive due process. "The substantive component of the Due

---

[42] Durbin Depo., p. 30 [Doc. 60]; James Depo., p. 30 [Doc. 58].
[43] *Oliver*, 586 F.3d at 905 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).
[44] *Pearson*, 555 U.S. at 236.
[45] U.S. CONST. amend. XIV §1.

Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty."[46]

The Supreme Court has tightly restricted the scope of substantive due process claims, noting its reluctance to expand the concept of substantive due process, because "guideposts for responsible decionmaking in this unchartered area are scarce and open-ended.  The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."[47]

Indeed, the Supreme Court has been particularly unreceptive to the central premise of Plaintiffs' position in this case, which is that the public has a substantive due process right to be protected by the government from criminals among us.  The Supreme Court in *Deshaney v. Winnebago County Department of Social Services*, clearly stated that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and propery of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."[48]   The Court pointed out that the provision's "purpose was to protect people from the State, not to ensure that the State protected them from each other."[49] "As a general matter," the Court concluded, "a State's failure to protect an individual against private violence simply does not

---

[46] *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (*en banc*) (internal citations omitted).
[47] *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125 (1992) (citation omitted).
[48] 489 U.S. 189, 195 (1989).
[49] *Id.* at 196.

13

constitute a violation of the Due Process Clause."[50]  Indeed, government actions will only violate substantive due process rights when the actions "shock[] the conscience."[51]

The Supreme Court originally recognized two exceptions to the *DeShaney* rule: (1) the "special-relationship" exception, where the State takes a person into custody, confining him against his will; and (2) the "state-created danger" exception, where the State affirmatively creates the danger or renders a person more vulnerable to an existing danger.[52] Plaintiffs argue this case falls within both of these exceptions. Specifically, Plaintiffs argue that Officer Guidry's so-called "promise" that Hurd would be incarcerated that evening created a "special relationship" between the State and Plaintiffs that gave rise to his affirmative duty to protect Plaintiffs; in releasing Hurd, Guidry affirmatively placed Plaintiffs in danger, thereby violating their substantive due process rights.

Clearly, the "special relationship" exception does not apply in this case, as it applies only in custodial situations, where the State has affirmatively limited the plaintiff's ability to protect his own interests.[53] Examples of special relationship cases include those involving incarcerated prisoners and involuntarily committed mental

---

[50] *Id.* at 197.
[51] *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).
[52] *See DeShaney*, 489 U.S. at 198-201; *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003).
[53] *Lovins v. Lee*, 53 F.3d 1208, 1210 (11th Cir. 1995) (citing *DeShaney*, 489 U.S. at 198-99).

patients—cases where "the government has some responsibility to assure, to the extent reasonably possible, the safety of such persons."[54]  Those special relationship decisions "stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."[55] "The duty in such cases arises from the limitations which the government imposed on the freedom of the individual to act on his own behalf."[56]  Here, Plaintiffs were not in custody.  They were members of the general public with no restrictions on their ability to act on their own behalf.  Thus, no special relationship existed between them and the City.

Likewise, the "state-created danger" exception does not apply in this case.  The "state-created danger" exception has been superceded by the standard set forth in the Supreme Court's decision in *Collins v. City of Harker Heights, Texas.*[57] Now, if victims, like Plaintiffs in this case, are not in the government's custody, the government's affirmative acts "rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense."[58] This standard "is to be narrowly interpreted and applied,"[59] such that "even

---

[54] *Id.*
[55] *DeShaney*, 489 U.S. at 199-200.
[56] *Lovins*, 53 F.3d at 1210 (citing *DeShaney*, 489 U.S. at 200).
[57] *Waddell*, 329 F.3d at 1305 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1998)).
[58] *Id.*
[59] *White v. Lemacks,* 183 F.2d 1253, 1259 (11th Cir. 1999).

intentional wrongs seldom violate the Due Process Clause."[60]   "To rise to the conscience-shocking level, conduct most likely must be 'intended to injure in some way unjustifiable by any government interest.'"[61]   "[O]nly the most egregious official conduct can be said to arbitrary in the constitutional sense," and the Court must conduct "an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."[62]

Here, although one might find fault with Officer Guidry releasing Hurd without warning the Plaintiffs, the release cannot be characterized as arbitrary or conscience shocking in a constitutional sense.  On the contrary, the evidence shows that in releasing Hurd, Guidry followed proper police department protocol, informing his supervisor of the situation and following his supervisor's orders. That Hurd attacked and harmed Plaintiffs as a result of Guidry's conduct in releasing him is unfortunate; but "[d]eterminations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor <u>must be egregious—that is shock the conscience—at the time the government actor made the decision</u>."[63]

Plaintiffs argue Guidry's decision to release Hurd was egregious because Guidry knew about and disregarded the threat of danger Hurd posed to Plaintiffs, as

---

[60] *Waddell*, 329 F.3d at 1305.

[61] *Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009 (quoting *Lewis*, 523 U.S. at 849).

[62] *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (internal quotations omitted).

[63] *Maddox v. Stephens*, __ F.3d __; 2013 WL 4437161, *7 (11th Cir. Aug. 21, 2013) (emphasis in original, citation omitted).

evidenced by Guidry's knowledge of Ms. Knight's statement that Hurd forced to her to hide at knife-point and her fear to tell the police; and that it took multiple officers to subdue Hurd in order to effectuate the arrest.  This evidence, however, does not reflect Guidry knew of and disregarded an "extremely great risk" that Hurd would return and harm Plaintiffs.[64]  Indeed, even armed with this information, Officer Guidry did not arrest Hurd for family violence because he believed he did not have probable cause to do so.  In fact, the victims provided conflicting statements as to whether Hurd had initially engaged in violence at all.  Guidry spoke with Ms. Knight, the main victim, and personally observed that she appeared calm and unharmed.

While in hindsight it would have been prudent for Guidry not to release Hurd, the release does not rise to the level of a constitutional violation.  Indeed, in *Lovins v. Lee*,[65] a case with more egregious circumstances than the one at bar, the Eleventh Circuit found no constitutional violation.  In that case, the plaintiff was kidnapped and brutally raped by a violent criminal who had been temporarily released from custody while serving a jail sentence.  Although the criminal was ineligible for release, and the defendants violated Georgia law by releasing him, the Eleventh Circuit held the criminal's release was not a violation of the plaintiff's substantive due process rights under the Fourteenth Amendment.  The Eleventh Circuit acknowledged the tragic

---

[64] *Id.*
[65] 53 F.3d 1208 (11th Cir. 2005).

circumstances of the case but made clear that the plaintiff's remedies for the egregious injury she suffered must be sought in state court.[66]

### ii.  Equal Protection

Plaintiffs also allege Officer Guidry violated their Fourteenth Amendment right to equal protection.  Specifically, Plaintiffs allege Guidry intentionally failed to protect them based on their low economic status and the fact they were female victims of gender-based violence.

The Equal Protection Clause of the Fourteenth Amendment prohibits states from enforcing laws in an invidiously discriminatory manner.[67]  "To state an equal protection claim based on the selective non-enforcement of domestic violence laws, Plaintiff[s] must establish that an animus toward women was a 'motivating factor' for the enforcement scheme."[68]  Plaintiffs have provided absolutely no evidence establishing any kind of discriminatory intent as to Officer Guidry and thus cannot establish any constitutional violation based on a violation of their right to equal protection.

---

[66] *Lovins*, 53 F.3d at 1211.

[67] *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

[68] *Hawkind v. Eslinger*, Case No. 6:07-CV-1261-Orl-19UAM, 2008 WL 215710, *7 (M.D. Fla., Jan. 24, 2008) (citing *Burella v. City of Phila.*, 501 F.3d 134, 148 (3d Cir. 2007); and *Watson v. City of Kan. City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988)).

In sum, Guidry owed no constitional duty to protect Plaintiffs from the bad acts of a third party.  Because Guidry violated no constitutional right, he is entitled to qualified immunity as to Plaintiffs' claims against him in his individual capacity.

2.  Chief Burns

Plaintiffs also assert an individual supervisory liability claim against Chief Burns. "[I]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."[69] "Instead supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional violation."[70]  However, "[t]he standard by which a supervisor is held liable in h[is] individual capacity for the actions of a subordinate is extremely rigorous."[71]

Plaintiffs here do not claim Chief Burns personally participated in any unconstitutional conduct but rather that his failure to implement adequate policies regarding the release of detainees with medical issues and the arrest of suspects who

---

[69] *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotations and citations omitted).
[70] *See Cotton v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).
[71] *Doe v. School Bd. of Broward County, Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (quotation marks omitted).

have outstanding warrants caused Officer Guidry to violate Plaintiffs' constitutional rights. Indeed, one way a plaintiff may establish a causal connection between the supervising official and the alleged constitutional violation is by showing that "the supervisor's improper custom or policy le[d] to deliberate indifference to constitutional rights."[72]  Plaintiffs' claim against Chief Burns, however, fails for a variety of reasons.

First and foremost, the claim against Chief Burns fails because, as explained above, Plaintiffs did not suffer a constitutional deprivation.  "The central tenet in [supervisory liability] is a constitutional or statutory violation[.]"[73]  If the underlying § 1983 claim fails, so does the supervisory liability claim.[74] Thus, because Plaintiffs suffered no deprivation of their constitutional rights, Chief Burns is entitled to qualified immunity. Second, even if Plaintiffs had suffered a constitutional deprivation, Chief Burns would nonetheless be entitled to summary judgment, because Plaintiffs have failed to set forth any facts or evidence showing that Chief Burns's alleged failure to implement policies led to deliberate indifference to Plaintiffs' constitutional rights.  Thus, Chief Burns is entitled to summary judgment.

## B.  Municipal Liability

Plaintiffs assert a municipal liability claim against the City of Macon, claiming it's failure to implement adequate policies and failing to train and supervise its police

---

[72] *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008) (quotation marks omitted).

[73] *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009).

[74] *Id.* ("Plaintiffs' claims under a theory of supervisory liability fail because the underlying § 1983 fail.") (citing *Hicks v. Moore*, 422 F.3d 1246, 1253 (11th Cir. 2005)).

officers in providing medical treatment to detainees and in handling arrestees with outstanding warrants, knowing such individuals pose a threat to the public, caused Officer Guidry to violate their substantive due process and equal protection rights.

The Supreme Court has placed "strict limitations on municipal liability."[75] A municipality is liable under § 1983 only if it is "found to have _itself_ caused the constitutional violation at issue; [a municipality] cannot be found liable on a vicarious liability theory."[76]  Instead, a municipality may be held liable for the actions of a police officer only when the municipal's policy or custom causes a constitutional violation.[77] To assert a claim under § 1983 against a municipality, "a plaintiff must show: (1) _that his constitutional rights were violated_; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."[78]  Where the policy itself is constitutional, inadequate police training may establish § 1983 liability if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact."[79]

First and foremost, the City is entitled to summary judgment because Plaintiffs have failed to establish any violation of their constitutional rights.  Since this Court has

---

[75] _Gold v. City of Miami_, 151 F.3d 1346, 1350 (11th Cir. 1998).

[76] _Skop v. City of Atlanta_, 485 F.3d 1130, 1145 (11th Cir. 2007).

[77] _Id.; see also Gold_, 151 F.3d at 1350; _Monell v. Dep't of Soc. Servs. of City of New York_, 436 U.S. 658, 690 (1978).

[78] _McDowell v. Brown_, 392 F.3d 1283, 1289 (11th Cir. 2004) (emphasis added).

[79] _City of Canton, Ohio v. Harris_, 489 U.S. 378, 388 (1989).

determined that Officer Guidry's conduct did not violate Plaintiffs' constitutional rights, the Court need not inquire into the City's policies and officer training relating to detainees with medical problems or arrestees with outstanding warrants.[80] However, even if Plaintiffs had suffered some constitutional deprivation, Plaintiffs wholly fail to establish that either the City's policies or the alleged inadequate officer training constitutes deliberate indifference to Plaintiffs' rights.  Accordingly, Plaintiffs' § 1983 claims against the City fail as a matter of law.

## C. Officer Guidry, Sergeant Smith, and Chief Burns, in their Official Capacities

Plaintiffs also assert claims against Officer Guidry, Sergeant Smith, and Chief Burns in their official capacities.  "An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [for which the official is an agent]."[81] Thus, a suit against the Defendants in their official capacities is merely duplicative of Plaintiffs' claims against the City directly, and these claims are entitled to dismissal as such.[82]

## II.   State Law Claims

Having granted summary judgment on Plaintiffs' federal claims, the Court must now determine whether it should exercise supplemental jurisdiction over the

---

[80] *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant ony when a constitutional deprivation has occurred.") (citations omitted).
[81] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).
[82] *See Joiner v. Fulton County, Ga.*, 160 F. App'x 891 (11th Cir. 2005) (affirming district court's dismissal of claims against defendants in their official capacities as duplicative of the claims against the County).

remaining state law claims.[83]   The Court may decline to exercise supplemental jurisdiction over non-diverse state law claims if:

(1) The claim raises a novel or complex issue of State law,

(2) The claim substantially predominates over the claim or claims over which the disctrict court has original jurisdiction,

(3) The district court has dismissed all claims over which it has original jurisdiction, or

(4) In exceptional circumstances, there are other compelling reasons for declining jurisdiction.[84]

Additionally, in deciding whether or not to exercise supplemental jurisdiction over pendent state law claims under § 1367(c), a court should also consider the interest of judicial economy, convenience, fairness to the litigants, and comity.[85]

Here, summary judgment is due to be granted as to all of the federal claims over which this Court has original jurisdiction.  "When the district court has dismissed all federal claims from a case, there is a strong argument for declining to exercise supplemental jurisdiction over the remaining state law claims."[86]   Moreover, the

---

[83] *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district court have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.").

[84] 28 U.S.C. § 1367(c).

[85] *See Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F3d 1559, 1569 (11th Cir. 1994).

[86] *Arnold v. Tuskegee Univ.*, 212 F. App'x 803, 811 (11th Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).

parties have raised issues concerning the public duty doctrine that require interpretation of state law which should be left to the state courts.  The Eleventh Circuit has repeatedly stated that "[s]tate courts, not federal courts, should be the final arbiters of state law."[87] Having fully considered the matter, the Court concludes that Plaintiffs' state law claims should be determined by the Georgia courts.  Thus, the Court finds it appropriate to decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c).

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment [Doc. 34] is hereby **GRANTED** as to Plaintiffs' federal claims.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and thus, those claims are hereby **DISMISSED without prejudice** to the parties litigating them in state court. Defendants' Motion to Exclude Experts' Testimony [Doc. 22] is **MOOT**.


**SO ORDERED,** this 27th day of September, 2013.

<u>S/  C. Ashley Royal</u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

SSH

---

[87] *See, e.g., Baggett v. First Nat. Bank of Gainesville*, 117 F.2d 1342, 1353 (11th Cir. 1997).